**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. _____

LEONARD ENGLISH,

      PLAINTIFF,

v.

SMALL BUSINESS ADMINISTRATION;
LINDA MCMAHON,
Administrator (sued in her official
capacity),

      DEFENDANTS.

---

### COMPLAINT AND JURY DEMAND

---

COMES NOW, Plaintiff, Leonard English, by and through his attorneys, the Roseman Law Offices, LLC, and hereby files this Complaint to recover for racial discrimination and retaliation in violation Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, et seq., in support of which he shows this Court as follows:

### I. PARTIES

1.    Plaintiff, Leonard English, (hereinafter "English") is a male citizen and resident of the United States, and Mobile County, Alabama, and is African American.  At all times relevant to this complaint, Plaintiff was employed with the United States Small Business Administration, from 2005 until his removal effective September 23, 2016.

2.      Defendant, United States Small Business Administration (hereinafter "Agency" or

"SBA"), is a United States government agency that provides support to entrepreneurs and small

businesses.  In order to carry out the policies of the Small Business Act, Congress created an

agency under the name "Small Business Administration," which Administration shall be under

the general direction and supervision of the President and shall not be affiliated with or be within

any other agency or department of the Federal Government.  The name of the organization where

English worked at the time that he was subjected to racial discrimination and retaliation was the

United States Small Business Administration, Office of Surety Guarantees at 721 19th Street,

Suite 426 Denver, CO 80202-2517.

## II. JURISDICTION

3.      This action is brought to remedy discriminatory and retaliatory acts pursuant to Title VII

of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et seq., as amended, as applied to the Federal

government and the interpretation of its statues.

4.      Jurisdiction of this Court is invoked pursuant to its original jurisdiction over cases and

controversies arising under federal law, pursuant to 28 U.S.C. § 1331.

5.      Venue herein is proper in this District pursuant to § 706 (f)(3) of Title VII, 42 U.S.C. §

2000e- 5(f)(3), 28 U.S.C. § 1331, and under C.S.R. § 24-34-401 et. seq.  This Court has

supplemental jurisdiction over the claims in this action arising under the laws of the State of

Colorado, and the principles of pendent jurisdiction.  Defendant, United States Small Business

Administration, exists under the laws of the State of Colorado.  The alleged unlawful and

wrongful acts of discrimination and retaliation were committed within the State of Colorado.

### III. PROCEDURAL REQUIREMENTS

6.      Defendant removed Plaintiff from his position of Surety Bond Guarantee Specialist with the Small Business Administration and the Federal government, effective September 23, 2016.

7.      Plaintiff filed a direct Merit Systems Protection Board (hereinafter "Board") appeal challenging the Agency's removal action, simultaneously with a request to stay the action, on September 26, 2016.

8.      On September 29, 2016, Administrative Judge Brooks issued an acknowledgment order in the instant case, and ordered the Agency to respond to Plaintiff's stay request by October 6, 2016.  Defendant responded on September 30, 2016, and Administrative Judge Brooks denied Plaintiff's request for a stay on October 18, 2016.

9.      On March 7, 2017, Administrative Judge Brooks affirmed Defendant's removal action of Plaintiff based on the charges of: (1) failure to follow leave procedures, (2) leaving worksite without approval, (3) absence without leave ("AWOL"), (4) failure to follow the instruction of a duly recognized authority (supervisor), and (5) unprofessional conduct.

10.     On or around April 28, 2017, Plaintiff filed a timely petition with the Equal Employment Opportunity Commission asking for review of a Final Order issued by the Merit Systems Protection Board ("MSPB") concerning his claim of discrimination in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), as amended, 42 U.S.C. § 2000e et seq.

11.     The EEOC's Office of Federal Operations issued their decision, on or around September 25, 2017, which concurred with the Board's final decision that Plaintiff did not establish that Defendant discriminated against him as alleged.  The OFO noted in this decision that Plaintiff had no further right to administrative appeal from the Commission's decision.

12.     Plaintiff has complied fully with all prerequisites to jurisdiction in this Court under Title

VII.  The Jurisdiction of the Court is proper pursuant to § 706 (f)(3) of Title VII, 42 U.S.C. §

2000e- 5(f)(3), 28 U.S.C. § 1331, and under C.S.R. § 24-34-401 et. seq.

## IV. GENERAL ALLEGATIONS

13.     At all times relevant hereto, Plaintiff, Leonard English was employed by the United States

Small Business Administration, and is a resident of Mobile County, State of Alabama.

14.     At all times relevant hereto, Defendant, United States Small Business Administration, is a

Federal government Agency, doing business in the State of Colorado.

## V. FACTS

15.     English worked as a GS-1101-12, Surety Bond Guarantee Specialist, for the U.S. Small

Business Administration ("SBA"), Office of Surety Guarantees ("OSG") in Denver, Colorado.

The Office of Surety Guarantees, located at SBA Headquarters, Washington, D.C., administers

the Surety Bond Guarantee Program.  The Surety Bond Guarantee Program has area offices in

Denver, Seattle, and Washington, D.C.

16.     English is a fifty (50) year old, African American male who has amassed a total of

approximately eleven (11) years of Federal service.  English was employed with SBA as a Surety

Bond Specialist beginning in 2007, and he was removed on September 23, 2016.  English was

the only employee in the Office of Surety Guarantee Program with a ten (10) year certificate of

service at the time of his removal.

17.     From September 2011 to September 23, 2016, English's first level supervisor was Ms.

Jennifer Vigil (Caucasian), Supervisory Surety Bond Guarantee Specialist, and his second level

supervisor was Mr. Peter Gibbs (African American), Deputy Director Office of Surety

Guarantees.  Prior to Mr. Gibbs assuming the Acting Director position, Frank Lalumiere was the Director, OSG, Washington, D.C., and English's third-line supervisor.  Mr. Lalumiere retired from SBA and Federal service on or around April, 2016.

18.    Beginning in 2014 and continuing thereafter until English was removed on September 23, 2016, Plaintiff was subjected to disparate treatment and a hostile work environment on the basis of racial discrimination and EEO retaliation.  Specifically, Jennifer Vigil, Richard Gomez, and Peter Gibbs subjected English to harassment and disparate treatment, and the Agency failed to investigate the discriminatorily-motivated, false complaints made by Jennifer Vigil and Richard Gomez, even after the complaints were proven to be false, thereby depriving Plaintiff of his rights.  Said deprivation culminated in Plaintiff's termination on September 23, 2016.

19.    At all times relevant to this complaint, Bridget Bean, former Chief Human Capital Officer, Office of Human Resources Solutions, Washington, D.C., was a SBA senior management official and management board member.

20.    At all times relevant to this complaint, Natalie Duncan, Deputy Chief Human Capital Officer, Office of Human Resources Solutions, Washington, D.C., was a SBA senior management official and management board member.

21.    At all times relevant to this complaint, Matthew Varilek, former Chief Operating Officer, Washington, D.C., was a SBA senior management official and management board member.

22.    At all times relevant to this complaint, Ann Marie Mehlum, former Associate Administrator for Capital Access, Washington, D.C., was a SBA senior management official and management board member.

23.      At all times relevant to this complaint, John Miller, Deputy Associate Administrator for Capital Access, Washington, D.C., was a SBA senior management official and management board member.

24.      At all times relevant to this complaint, Larry Stubblefield, Assistant Administrator for the Office of Diversity, Inclusion and Civil Rights, Washington, D.C., was a SBA senior management official and management board member.

25.      At all times relevant to this complaint, Ramona Powell was the Chief of Workforce Relations, Office of Human Resources Solutions, Denver, Colorado.  That division advises management on personnel issues for the Agency.

26.      At all times relevant to this complaint, Betsy Markey was the Regional Administrator for SBA Region VIII, which included Denver, and she was a SBA management board member.

27.      At all times relevant to this complaint, Joshua Vigil was an Employee/Labor Relations Specialist in SBA's Office of Human Resources Solutions, Denver, Colorado.  Ms. Powell was his first-level supervisor at the time English was removed from his position.

28.      At all times relevant to this complaint, English was a member of the bargaining unit for which conditions of employment were covered by the 2013 Master Labor Agreement (hereinafter "MLA") between SBA and the American Federation of Government Employees, Council 228.

29.      At all times relevant to this complaint, Plaintiff worked with Richard Gomez (Hispanic), Leslie Long (Asian), Gia Vu (Asian), Beryl Williams (African American).  Those employees shared the same title and responsibilities as English.  However, English's and Ms. Williams' seniority and tenure were greater than most of his aforementioned co-workers.  Ms. Williams had

over thirty (30) years of working experience who was constructively removed in or around August of 2014 after Ms. Vigil issued numerous baseless and unfounded disciplinary actions against her.

30.     Jennifer Vigil has had a total of three (3) African Americans under her supervision: Walter Lee; Beryl Williams; and Leonard English.  All three (3) individuals filed complaints where they alleged that they were subjected to racial discrimination in the workplace.

31.     For Fiscal Year 2013, Ms. Vigil rated English at level five (5), which was the highest rating option, with no behavioral issues noted.

32.     On April 26, 2013, Ms. Vigil posted her official line of succession list where she designated Richard Gomez and Leslie Long to carry out her duties in the event that she was absent from the workplace.  Ms. Vigil purposely left the African American employees, to wit: Leonard English and Beryl Williams, off the line of succession list.

33.     Ms. Vigil stated that she did not include English's name on the line of succession list at the time because he was out on leave at the time the list was published, and he did not return to work until August of 2013.  Ms. Vigil further explained that she had a set of line of succession when English returned to work, and she saw no need to change it.

34.     Beginning in April of 2014 and continuing thereafter until English's removal, Ms. Vigil abused her authority in the office in relations to how she treated her subordinates.  Mainly, she subjected the African American employees in the office to disparate treatment and punishment as she treated her subordinates that were not African Americans more favorably in the workplace.

35.     In April, 2014, English called Ms. Vigil to inform her that Mr. Gomez had approached his cubicle and inappropriately said, "God Damn, Leonard, Beryl has been over here for 45

minutes talking to you." Mr. Gomez engaged in offensive and intimidating behavior towards English in the workplace.

36.     On April 16, 2014, Ms. Vigil issued a quarterly review to English where she rated his work performance as exceptional. She also noted that English's administrative duties were performed correctly, and in a timely manner.

37.     Between April 17, 2014 and April 18, 2014, Mr. Gomez became defensive and exhibited aggressive and unprofessional behavior towards English via email concerning who would have been assigning files for the day.

38.     In April of 2014, Mr. Gomez made a comment to English about how he had been involved in a violent incident previously, and how Mr. Gomez was generally not afraid of confrontation. English took this as an indirect or veiled threat from Mr. Gomez as the two (2) men were not on good terms at the time. In response to that incident, English filed a complaint via email to Ms. Vigil about the conversation with Mr. Gomez where he told English about a prior assault charge. English avers that Mr. Gomez told him that the Agency had cleared him of the incident during the background check.

39.     English expressed concern because Mr. Gomez allegedly had a record of violent behavior in his official personnel file, and that it was improper for the Agency to continue to force the other employees to work in the same place as him. Mr. Gomez's violent past is well-documented as he filed an appeal challenging the adverse action that was issued to him in response to that violent incident. This is a matter of public record as it was filed with the Merit Systems Protection Board.

40.     After English's complaint to Ms. Vigil, and subsequent discrimination complaint, Ms. Vigil began subjecting English to overly harsh scrutiny concerning his work performance.  She also began criticizing his office email etiquette, which included the use of punctuations and the tone of his emails to her.  Ms. Vigil then began retaliating against English in the workplace by lowering his performance reviews, and issuing baseless disciplinary actions to him.

41.     On April 18, 2014, English submitted a complaint to Peter Gibbs and Jennifer Vigil alleging that he had been subjected to a hostile work environment, and that the Agency should conduct an investigation into the matter.  The Agency failed to conduct an impartial or thorough investigation into English's complaint of harassment.  It initially took Ms. Vigil nearly a month to even respond to English's complaint regarding the incident.  When Ms. Vigil did finally address it while Mr. Gibbs was in town, she informed English that she would speak to Mr. Gomez.  However, she failed to formally discipline him or address the matter in a timely fashion, and she kept him on the line of succession despite his egregious misconduct in the position.

42.     On April 22, 2014, Ms. Vigil revised the line of succession list to include Tamara Murray.  Earlier that same day, English emailed Ms. Vigil asking when he would be added to the list to which she responded that she will keep her line of succession list as it stood.  Ms. Vigil stated that she did not include English on the line of succession list because he was out of the office the first time she created it, but she amended the list later to include Tamara Murray.

43.     On the revised line of succession list, Mr. Gomez was number one (1) on the line of succession list; Leslie Long was number two (2) on the list; and Tamara Murray was number three (3) on the list.  English expressed concern over this because he and Ms. Williams were the employees in the office with the highest seniority, yet they were overlooked by Ms. Vigil.

44.      On May 23, 2014, English submitted a complaint to Peter Gibbs, Kelly Robinson, and Ramona Powell alleging that he had been subjected to a hostile work environment, and that the Agency should conduct an investigation into the matter.  The Agency failed to conduct an impartial or thorough investigation into English's complaint of harassment.

45.      On June 18, 2014, English formally filed an EEO complaint of discrimination, SBA Case Number 05-14-037, with the Agency's Office of Diversity, Inclusion and Civil Rights.  In the complaint, English averred that Ms. Vigil subjected him to racial discrimination.

46.      On July 22, 2014, Ms. Vigil had stated that English was "performing at a high level." However, she rated him lower, on October 24, 2014, where she faulted him for administrative errors and alleged unprofessional communication in the office.  English avers that she only began highlighting those alleged performance deficiencies in order to paint him as an underperforming employee following his complaints.

47.      On August 15, 2014, Ms. Vigil issued a letter of reprimand to English for asking who would help with processing the mail, using three (3) questions marks in a row, and saying that an inner circle existed.  Ms. Vigil formally reprimanded English, on August 15, 2014, when he indicated to her that he felt that she had an "inner circle" of employees that she treated more favorably than her African American employees.  This incident unnecessarily interfered with English's ability to perform the duties of his position in the workplace.

48.      On October 24, 2014, Ms. Vigil gave English an overall performance rating of three (3) for the fiscal year 2014 period of October 1, 2013 through September 30, 2014, as well as a three (3) for all five (5) elements.  She downgraded English's performance review that was not

consistent with the three (3) previous quarterly reviews. This was supported by Mr. Gibbs as well.

49.     On October 28, 2014, English submitted a complaint to Frank Lalumiere alleging that he had been subjected to a hostile work environment, and that the Agency should conduct an investigation into the matter. The Agency failed to conduct an impartial or thorough investigation into English's complaint of harassment.

50.     On December 11, 2014, English submitted a complaint via email to Bridget Bean alleging that he had been subjected to a hostile work environment, and that the Agency should conduct an investigation into the matter. The Agency failed to conduct an impartial or thorough investigation into English's complaint of harassment.

51.     On December 17, 2014, Jennifer Vigil was interviewed by an EEO investigator during the formal investigation of English's discrimination complaint, SBA Case Number 05-14-037. This establishes that she was aware of English's prior EEO activity by participating in the formal investigation of his discrimination complaint.

52.     On December 18, 2014, Peter Gibbs was interviewed by an EEO investigator during the formal investigation of English's discrimination complaint, SBA Case Number 05-14-037. This establishes that he was aware of English's prior EEO activity by participating in the formal investigation of English's discrimination complaint.

53.     On December 23, 2014, English submitted another complaint via email to Bridget Bean alleging that he had been subjected to a hostile work environment, and that the Agency should conduct an investigation into the matter. The Agency failed to conduct an impartial or thorough investigation into English's complaint of harassment.

54.     On February 2, 2015, English sent another email to Bridget Bean alleging that he had been subjected to a hostile work environment, and that the Agency should conduct an investigation into the matter.  The Agency failed to conduct an impartial or thorough investigation into English's complaint of harassment.

55.     On February 20, 2015, Ms. Vigil proposed a five-day suspension against English where she accused him of emailing her when he was out sick and allegedly not informing her that he had updated a phone number in the emergency notification system ("ENS").  Ms. Vigil thought Plaintiff would trust her to accurately report his phone conversation.  The senior manager threw out the sick leave email allegation.  Plaintiff updated all contact information in the ENS.  That proposed action was downgraded to a letter of reprimand, after a senior manager, Linda Rusche, reviewed his response letter for four (4) months.  The response letter to the senior manager was a protected EEO complaint, including a disclosure of all English's protected complaints and activities to date.  That letter of reprimand was being challenged in the second EEO complaint.

56.      On March 10, 2015, English sent a letter to Ms. Rusche where he reported instances of harassment and that he had been subjected to a hostile work environment.  Further, he reported that Jennifer Vigil and Peter Gibbs were abusing their authority in the workplace, and how it adversely affected his rights.  This complaint was sent directly to Linda Rusche, former Director of Financial Assistance and current Director of Credit Risk Management.

57.     On May 18, 2015, Mr. Peter C. Gibbs, Deputy Director, issued a letter of reprimand to English where he exaggerated a minor incident that happened on May 11, 2015 involving English's work performance.  However, Mr. Gomez is another employee in the same position as English, and under the same supervisory chain of command as Mr. Gomez.  Mr. Gomez did not

follow the procedure on the same request, and he did not receive any disciplinary action.  Mr. Gibbs issued the May 18, 2015 Letter of Reprimand about three (3) hours after he had signed a mediation agreement from the Merit Systems Protection Board.  This is further evidence that English was subjected to disparate treatment in the workplace.

58.     On May 20, 2015, English filed a prohibited personnel practices complaint naming Ms. Vigil, Mr. Gibbs and Mr. Lalumiere as the responsible management officials.

59.     On May 23, 2015, English filed a complaint to Bridget Bean alleging that he had been subjected to a hostile work environment and that certain management officials engaged in prohibited personnel practices, and that the Agency should conduct an investigation into the matter.  The Agency failed to conduct an impartial or thorough investigation into English's complaint of harassment.

60.     On June 2, 2015, English submitted a complaint to Bridget Bean alleging that he had been subjected to a hostile work environment, and that the Agency should conduct an investigation into the matter.  The Agency failed to conduct an impartial or thorough investigation into English's complaint of harassment.

61.     On July 16, 2015, English reported to Bridget Bean, Chief Human Capital Officer and Deputy Chief Operating Officer, that Ms. Vigil had provoked him and that she had refused to provide guidance to him.  Ms. Bean then improperly refused to take corrective action against Ms. Vigil in response to the complaint.  This incident unnecessarily interfered with English's ability to perform the duties of his position in the workplace.

62.     On July 17, 2015, English averred that he was forced to request telework as Ms. Vigil was exhibiting volatile behavior towards him.  The Agency improperly denied his request for

telework at the time.  This incident unnecessarily interfered with English's ability to perform the duties of his position in the workplace.

63.     On July 17, 2015, English submitted a complaint to Bridget Bean alleging that he had been subjected to a hostile work environment, and that the Agency should conduct an investigation into the matter.  The Agency failed to conduct an impartial or thorough investigation into English's complaint of harassment.

64.     On July 20, 2015, Ms. Linda Rusche, Director of Credit Risk Management, mitigated the proposed suspension to a letter of reprimand.  She stated that the second specification is not supported by the evidence on the record.  The fact the deciding official mitigated the disciplinary action establishes that Ms. Vigil was issuing harsher-than-required disciplinary actions to him because he had previously filed complaints naming her as the responsible management official.

65.     In August of 2015, Ms. Vigil stated during her investigative interview that she already knew about English's prohibited personnel practices ("PPP") complaint from May 20, 2015.  The EEO counselor also went over two (2) other December 2014 harassment disclosures to Ms. Bean, and an April 2015 OSC contact with Ms. Vigil.

66.     On August 12, 2015, Ms. Vigil improperly downgraded English's Fiscal Year ("FY") 2015 third quarterly performance review in retaliation for his complaint.  Ms. Vigil began lowering English's performance ratings after he filed his complaints in order to dissuade him from filing subsequent complaints.

67.     On August 30, 2015, English formally filed his second EEO complaint of discrimination, SBA Case Number 07-15-052, with the Agency's Office of Diversity, Inclusion and Civil

Rights.  This was due to the ongoing discrimination, retaliation, and harassment that he had been subjected to since he filed his first EEO complaint of discrimination in 2014.

68.     On October 29, 2015, English's performance rating was wrongfully lowered to a level 2 rating for his FY 2015 performance review.

69.     On October 29, 2015, English was informed that his telework schedule was terminated with an effective date of November 2, 2015 due to his alleged performance deficiencies.  English also avers that Ms. Vigil was unnecessarily hostile in their meeting to discuss his performance rating.

70.     In November of 2015, Ms. Vigil issued Plaintiff a negative performance review that was full of suspicious comments regarding English.  Mr. Gibbs agreed with the performance review.  Ms. Vigil even said what another surety bond specialist had to say about Plaintiff's performance in the FY15 third quarter review.

71.     On November 2, 2015, Ms. Vigil terminated English's telework privileges due to alleged poor work performance.  English challenged that decision, and there was supposed to be a five (5) day period before the decision became final.  English's union agreement stated that Ms. Vigil prematurely revoked his telework privileges before the performance evaluation as final.  As such, he did not report into the office because the Talent Management Center had not given him notice that his performance review was final until November 5, 2015.

72.     On November 3, 2015, Ms. Vigil wrongfully and prematurely charged English with three (3) hours of absent without leave ("AWOL").

73.     On November 3, 2015, English filed a complaint with Natalie Lui Duncan where he alleged that he had been subjected to a hostile work environment, and that the Agency should

conduct an investigation into the matter.  The Agency failed to conduct an impartial or thorough investigation into English's complaint of harassment.

74.     Between November 3, 3015 and December 15, 2015, English sent several emails to Natalie Lui Duncan where he reported that he had been subjected to a hostile work environment, and that the Agency should conduct an investigation into the matter.  The Agency failed to conduct an impartial or thorough investigation into English's complaint of harassment.

75.     On November 5, 2015, English's request for an independent inquiry by the Critical Incident Response Term ("CIRT") was denied.

76.     On December 11, 2015, Ms. Vigil issued to English a notice of proposed suspension for thirty (30) days for: (1) failure to follow the instruction of a duly recognized authority (supervisor); (2) continuing disrespectful and disruptive conduct; (3) absent without leave ("AWOL"); and (4) unprofessional conduct.  This stemmed from an issue that English had with his kidney stones.

77.     On December 16, 2015, Ms. Vigil was interviewed by an EEO investigator during the formal investigation of English's discrimination complaint, SBA Case Number 07-15-052.

78.     During Fiscal Year 2016, the Surety Bond Guarantee Specialists in the Denver Area Office who were under Ms. Vigil's supervision were: English, Richard Gomez (Hispanic, no prior EEO activity), Leslie Long (Asian, prior EEO activity (assisting with investigation)), Gia Vu (Asian, no prior EEO activity).  English was the only African American that worked as a Surety Bond Specialist in OSG, Denver, in Fiscal Year 2016.

79.     At all times relevant to this complaint, Ms. Vigil had authority to receive and approve

English's requests for leave.  Ms. Vigil began using this authority to issue baseless disciplinary

actions to English in the workplace.

80.     During FY 2016, English worked a flexible 5/4-9 schedule, wherein he worked eight 9-

hour days, one 8-hour day, and a flex day off on the second Monday of each pay period.  During

FY 2016, English's working hours on the days wherein he worked 9-hour days were 7 a.m. to

4:30 p.m.

81.     On January 19, 2016, English submitted a reply in opposition to the proposed thirty (30)

day suspension where he again reported that he had been subjected to many acts of harassment

and retaliation in the office.

82.     On February 23, 2016, English submitted a complaint to the Agency's EEO office

alleging that he had been subjected to a hostile work environment.  English was charged with

being AWOL when he was out sick with kidney stones.  This was proven by English's hospital

receipts from his emergency visit.  Mr. Gibbs forced English to get his doctor to write that he

was "incapacitated" on a note, before Mr. Gibbs approved back pay for English's sick leave.

83.     During the week of April 18, 2016, Ms. Vigil had consistently made false statements

about English's behavior and work performance.  During this time, English had also just

received Ms. Vigil's affidavit that was taken during the formal investigation of English's initial

discrimination complaint from December, 2015.

84.     In her affidavit, Ms. Vigil had falsely accused English of stalking her in the parking lot,

which resulted in English being apprehensive about being alone with Ms. Vigil.  He viewed her

stalking allegation as evidence that Ms. Vigil was capable of fabricating events in order to support her own agenda to have English removed.

85.     On April 22, 2016, English's worksite was at SBA, 721 19th Street, Denver, Colorado. Friday, April 22, 2016 was English's 8-hour workday, wherein his tour of duty ended at 3:30 p.m.

86.     On April 22, 2016, Ms. Vigil wanted to meet with English on suspicious circumstances. Plaintiff performed a self-removal, according to the Agency's 2013 Master Labor Agreement, because of his concerns about meeting alone with Jennifer Vigil.  This was after he had just found out about a false and malicious stalking allegation by Jennifer Vigil against English that was located in her December 2015 EEO affidavit.  Prior to the week of April 18, 2016, no one with the agency had discussed the stalking allegation with English.

87.     After Ms. Vigil instructed English in a Lync message to meet with her in her office on April 22, 2016, English and Ms. Vigil had a discussion at English's desk on April 22, 2016.  Ms. Vigil tone made English fearful for his own safety in the office.  During the discussion at English's desk on April 22, 2016, Ms. Vigil instructed English to meet with her in her office.

88.     On April 22, 2016, during the discussion with Ms. Vigil at English's desk regarding bid applications, English stated to her, "I am self-removing."

89.     On April 22, 2016, English performed a self-removal, at approximately 2:00 p.m., which was 2.5 hours before the end of his tour of duty.  However, English's time was improperly coded as AWOL for 2.5 hours for April 22, 2016.  English had a reasonable belief that he was in an unsafe work environment because of his supervisor's behavior, and Ms. Vigil's allegation that English had stalked her in the parking lot.

90.     On April 24, 2016, Plaintiff sent an email with an attached letter to seven (7) key senior managers, including two (2) in his chain of command at the Administrator level, detailing the self-removal and all protected complaints to date.  Plaintiff also mentioned the false and malicious stalking allegation by Jennifer Vigil in the letter.  Subsequently, Plaintiff sent several follow-up emails to the senior management officials while he was out of the office during the self-removal.  Mr. Gibbs wrongfully ordered English back into the workplace, but he did not have the requisite authority (Associate or Regional Administrator) to do so.  This was a harmful procedural error that improperly resulted in English's removal from Federal service.

91.     On or around April 25, 2016, English explained his actions to Ms. Mehlum and Mr. Miller, and he reported that he had been subjected to a hostile work environment in correspondence to senior management officials, including Ann Marie Mehlum and John Miller. Ann Maire Mehlum and John Miller had oversight of the Office of Surety Guarantees while English was employed with the Agency.

92.     The 2013 Master Labor Agreement, Article 20, Sections 4 and 5, clearly states that an employee the right to perform a self-removal when they feel that they are in an unsafe environment.  The Agency should have placed English on administrative leave until an investigation was conducted into the matter.  Further, the MLA states that an agency representative at the Regional Administrator or Associate or Assistant Administrator level in Washington, D.C. has to make the decision regarding the self-removal.  Thus, Mr. Gibbs did not have the requisite authority to order English back into the office before the Agency had conducted an investigation into the matter first.

93.     Ms. Vigil knew that it was a self-removal because she mentioned in her August 4, 2016 notice of proposed removal issued to English.  Mr. Gibbs was informed of the self-removal, and the reasons why in English's reply to the notice of proposed removal.  English was not required to request leave, submit a leave slip, and he was improperly charged with being AWOL.

94.     On April 25, 2016, Mehlum sent Peter Gibbs and John Miller the letter that explained English's self-removal, had protected disclosures in it against Jennifer Vigil and himself, and listed most of his protected disclosures to date against him and Jennifer Vigil.

95.     Subsequently, English waited for the senior-level management officials to give him the all-clear response, and he initiated contact with them for weeks but they never responded.  This was a violation of Agency's Standard Operating Procedures ("SOP") 37 15, the anti-harassment statements and procedures.  According to Agency SOP 37 15, any manager that is sent a harassment complaint has a duty to response and act.

96.     From April 26, 2016, to May 17, 2016, English did not report for duty.  English's time was coded as AWOL for one hundred and thirty-four (134) hours for his absence.  This charge was completely improper and baseless.  The 2013 Master Labor Agreement ("MLA"), Article 20, Section 4 did not require submission of a leave slip.  Section 4 specifically stated that an employee should not be on any type of leave, considered AWOL, or insubordinate.  The article of the MLA that English relied upon for his "self-removal" on April 22, 2016 was Article 20, Safety Health, Sections 4 and 5.  The MLA did not say a leave slip was needed even if the employee was found to be wrong in their belief of an unsafe work environment.

97.     On May 3, 2016, Joshua Vigil ("WRD") requested a phone conversation with John Miller about English's April 24, 2016 letter.

98.     On May 3, 2016, John Miller sent Joshua Vigil the letter that explained English's self-removal, and had protected complaints and disclosures in it against Jennifer Vigil, Peter Gibbs, and Ramona Powell.  The letter also listed most of English's protected disclosures to date against Mr. Gibbs and Ms. Vigil.

99.     English contacted the senior management officials for several weeks after his self-removal for assistance, and to determine the status of the matter.  None of the senior-level management officials responded to English on the status of the matter or to assist him.

100.    On May 10, 2016, English filed an EEO complaint where he named Matthew Varilek, Ann Marie Mehlum, John Miller, Peter Gibbs, and Ramona Powell as responsible management officials based on their lack of response to the April 22, 2016 incident, the AWOL charge related to it, and their suspected involvement and/or lack of action in properly resolving the matter. English sent this complaint directly to senior-level management official, Larry Stubblefield.

101.    On May 17, 2016, Mr. Gibbs issued the decision letter suspending English from his position for thirty (30) days.  English served the thirty (30) day suspension from May 18, 2016 to June 16, 2016.  Mr. Gibbs considered the thirty (30) day suspension as English's prior discipline in deciding to remove English.  English appealed Administrative Judge Brooks' Initial Decision for the thirty (30) day suspension appeal by Petition for Review.

102.    On June 14, 2016, English submitted a complaint via email to senior-level management officials, including the Administrator and Deputy Administrator, alleging that he had been subjected to a hostile work environment.  Following this event, Ms. Vigil subjected English to even more intense harassment when he returned to the office after submitting this complaint.

103.     On June 23, 2016, English submitted a complaint to senior-level management officials, including Jennifer Vigil and Peter Gibbs, alleging that he had been subjected to a hostile work environment.

104.     On July 20, 2016, English submitted a complaint to senior-level management officials where he reported that he had been subjected to a hostile work environment, and that the Agency should conduct an investigation into the matter.  The Agency failed to conduct an impartial or thorough investigation into English's complaint of harassment.

105.     English avers that, from 2014 to 2016, Ms. Vigil entered English's cubicle on a number of occasions where she spoke to him in a loud and condescending manner.  She also issued disciplinary actions that were baseless, arbitrary, and capricious personnel actions.

106.     On August 4, 2016, Ms. Vigil, Proposing Official, proposed English's removal based on the following five (5) charges: (1) failure to follow leave procedures; (2) leaving the worksite without approval; (3) absent without leave ("AWOL"); (4) failure to follow the instruction of a duly recognized authority (supervisor); and (5) unprofessional conduct.

107.     On September 23, 2016, Mr. Peter C. Gibbs, the Deciding Official for the removal proposal, sustained all of the charges proposed by Ms. Vigil and effected the removal on September 23, 2016.

108.     In the removal decision, Mr. Gibbs made a false statement in his decision letter when he said that a Director was the equivalent of an Assistant Administrator.

109.     Joshua Vigil had no managerial authority with the Agency.

110.    From 2014 to 2016, English made numerous protected disclosures and complaints to senior-level management, which were ignored or disregarded at all times relevant to this complaint.

111.    English was the only subordinate in the office that had been issued any type of discipline by Jennifer Vigil and/or Peter Gibbs.  This was despite that Mr. Gomez had engaged in loud and profanity-laced tirades in the office.  This establishes that Ms. Vigil subjected the African Americans under her supervision to harsher treatment than her other subordinates.

112.    Jennifer Vigil made two (2) baseless allegations of English stalking her in the parking lot, and she called FPS about English regarding that alleged incident.

113.    English sent approximately twenty (20) protected complaints, and two (2) formal EEO complaints against Jennifer Vigil and Peter Gibbs regarding suspected discrimination, retaliation, harassment, and other suspected misconduct from May 2014 through August 2016 to senior management, the Office of Special Counsel, and congressional members.  The Agency never investigated any of English's complaints or asked Plaintiff one (1) question about his concerns.

114.    Plaintiff was charged with AWOL, but the 2013 Master Labor Agreement clearly stated that an employee should not be charged with AWOL when they perform a self-removal.

115.    At all times relevant to this complaint, Plaintiff was forced to work with Mr. Gomez in the office alone, and Mr. Gomez was allowed to review Plaintiff's work up until English's removal.

116.    Prior to the protected complaints and activities, Plaintiff had a clean personnel file with no derogatory information in it, and English had high performance reviews.  Plaintiff also had no formal or informal derogatory information against him.

## VI. FIRST CAUSE OF ACTION

### Racial Discrimination

117.    Plaintiff repeats, re-alleges, and incorporate herein by reference every allegation

contained in paragraphs 1-116 above as if fully set forth.

118.    Plaintiff Leonard English is a member of a protected group based upon his race.  English

is of African American descent and background.  His physical characteristics are also associated

with that of the African American race.

119.    Ms. Vigil (Caucasian) treated English differently than his coworkers based upon his

African American race.  He was prohibited from being included on the line of succession list for

the following dates: April 22, 2104, January 2, 2015, March 4, 2015, September 29, 2015, and

March 11, 2106.  This effectively amounts to disparate treatment because Ms. Vigil included

several members outside of English's protected group on the list, and she stated that she did not

include him on the list because he was out of the office at the time she created the list.  This

turned out to be false because she later amended the list to include another employee.

120.    Mr. Gibbs also subjected English to harsher scrutiny and disciplinary actions than his

coworkers when English was issued a letter of reprimand on May 18, 2015 for the same conduct

that his co-worker, Richard Gomez (Hispanic) engaged in as well.  However, Mr. Gomez did not

receive a disciplinary action for the same conduct.  He was also suspected of time and attendance

abuse, but he was never disciplined for that by Ms. Vigil either.  Mr. Gibbs issued the May 18,

2015 Letter of Reprimand about three (3) hours after he had signed a mediation agreement from

the Merit Systems Protection Board.  English contended that Ms. Vigil demonstrated her bias

against African American employees based on this action as she failed to discipline employees

outside of English's protected group for similar or same conduct. This improperly motivated his removal from Federal service in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et seq.

121. Ms. Vigil and Mr. Gomez subjected English to unwanted, offensive, and intimidating harassment and a hostile work environment, and the Agency failed to investigate English's many complaints reporting the harassment. Mr. Gomez went on a loud, profanity laced tirade in the workplace, which he has admitted to previously. The fact that Ms. Vigil refused to reprimand Mr. Gomez for his egregious misconduct in the workplace is further evidence of her racial bias manifesting in the workplace.

122. The harassment English endured was sufficiently severe and pervasive so as to affect a term, condition, or privilege of employment. English was forced to endure ongoing harassment and disparate treatment as a part of his employment until he was removed from the Agency.

123. As a result of the Agency's actions described above, Defendant is liable to English for those violations of Title VII of the Civil Rights Act of 1964, and 42 U.S.C. § 2000e, et seq.

124. The Plaintiff has suffered serious economic loss, physical and serious mental distress as a result of this unlawful racial discrimination.

125. It has been necessary for the Plaintiff to retain the services of an attorney to redress these wrongs.

126. Plaintiff is entitled to be fully compensated for all the damages that he has sustained.

127. Plaintiff is now suffering, and will continue to suffer, irreparable injury and monetary damages as a result of the alleged discriminatory practices unless and until this Court grants relief.

## VI. SECOND CAUSE OF ACTION

### Retaliation

128.    Plaintiff Leonard English engaged in protected equal employment opportunity ("EEO")

activity when he filed a formal complaint of discrimination on June 23, 2014, and the

aforementioned subsequent complaints that he filed to the appropriate agency officials.  In the

complaint, English alleged that Ms. Vigil subjected him to racial discrimination, among others,

in the workplace based on the theory of disparate treatment and harassment.

129.    Plaintiff engaged in protected activity through participation in the statutory complaint

process.  He filed a discrimination complaint with the Equal Employment Opportunity

Commission ("Commission").

130.    Plaintiff had a good-faith belief that Ms. Vigil subjected him to discrimination based

upon his race.  He reasonably believed that he was treated differently because he is African

American.

131.    Defendant, by and through its employees and agents, subjected Leonard English to

adverse treatment that would reasonably likely deter protected activity.  Defendant subjected

English to harsher scrutiny of his work performance following the filing of his discrimination

complaint.  Defendant issued disciplinary actions to English for conduct that his co-workers

engaged in without being disciplined.  Defendant wrongfully denied English's request for

telework due to the hostile work environment that he had been subjected to during the relevant

time period.  Defendant improperly proposed a five (5) day suspension against English, which

was later reduced to a letter of reprimand.  Defendant failed to properly investigate English's

many reports and complaints that he had been subjected to a hostile work environment in the workplace.

132.    English's engagement in prior protected activity, where he named his first and second level supervisors as the responsible management officials, was the cause of the removal action, and the cause of the adverse actions leading up to English' removal.  The adverse actions occurred or began within the same time frame and/or concerned similar subject matter as the basis for English's complaints of discrimination.

133.    In the notice of proposed removal, Ms. Vigil violated policies and procedures.  She charged Plaintiff with contacting a senior management official, Chief Human Capital Officer, about her, because of her suspected discrimination, retaliation, harassment, and time and attendance abuse.  Ms. Vigil charged Plaintiff with being AWOL for three (3) hours when Plaintiff was actually teleworking.  Ms. Vigil charged Plaintiff with asking her if she thought English was her child when she called English in a hostile and condescending manner.  Ms. Vigil charged Plaintiff with asking an agent to refer to the surety bond reference guide.  Ms. Vigil charged Plaintiff with unprofessional conduct (flirting) because Plaintiff had a normal conversation with two (2) female surety agents.  English avers that no reasonable person would conclude that Plaintiff's conversations were inappropriate.  English's second EEO complaint was subsequently amended to include the 30-day suspension.  Peter Gibbs confirmed the 30-day suspension that was proposed by Jennifer Vigil on May 17, 2016.  This occurred after the April 24th email and letter from English to senior management.  Plaintiff has email proof that the April 24, 2016 email and letter was sent to Mr. Gibbs by his supervisor on April 25, 2016.  The Merit Systems Protection Board and the Equal Employment Opportunity Commission failed to

acknowledge the numerous protected complaints against Ms. Vigil and Mr. Gibbs in their

decisions.  However, they did acknowledge Ms. Vigil baseless stalking allegation against

English though.

134.    Plaintiff avers that Agency management began retaliating against English in 2014

because of his formal complaint against Richard Gomez on April 18, 2014.  Gomez had

derogatory information in his employment file from a previous Federal agency.  Following

Gomez's violent incident, Peter Gibbs hired Mr. Gomez to work in the Office of Surety

Guarantee Program.  Peter Gibbs and his supervisor at the time, Frank Lalumiere, made the

decision to retain Mr. Gomez after they became aware of Mr. Gomez's previous violent incident.

Plaintiff avers that Mr. Gibbs and Mr. Lalumiere were embarrassed by their horrendous decision

to allow Mr. Gomez to stay in the office, and that improperly motivated English's removal.

135.    As a result of the Agency's actions described above, Defendant is liable to English for

those violations of Title VII of the Civil Rights Act of 1964, and 42 U.S.C. § 2000e, et seq.

136.    The Plaintiff has suffered serious economic loss, physical and serious mental distress as a

result of this unlawful racial discrimination.

137.    It has been necessary for the Plaintiff to retain the services of an attorney to redress these

wrongs.

138.    Plaintiff is entitled to be fully compensated for all the damages that he has sustained.

139.    Plaintiff is now suffering, and will continue to suffer, irreparable injury and monetary

damages as a result of the alleged discriminatory practices unless and until this Court grants

relief.

## VII. PRAYER FOR RELIEF

WHEREFORE, Plaintiff, respectfully requests that this Court enter a judgment:

(a).    Declaring that the acts and practices complained of herein are in violation of Title

VII;

(b).    Enjoining and permanently restraining these violations of Title VII;

(c).    Reinstatement to his former position;

(d).    Directing Defendants to take such action as is necessary to ensure that the effects

of these unlawful employment practices are eliminated and do not continue to affect Plaintiff's

employment opportunities;

(e).    Compensation for Plaintiff's compensatory damages and actual damages;

(f).    Removal of all negative and disciplinary actions related to this matter from

Plaintiff's official personnel file;

(g).    Back pay from the date of removal to the present;

(h).    Awarding Plaintiff the costs of this action together with reasonable attorneys'

fees, as provided by § 706(k) of Title VII, 42 U.S.C. § 2000e-6(k); and

(i).    Granting such other and further relief as this Court deems necessary and proper.

### DEMAND FOR A TRIAL BY JURY

Pursuant to Rule 39(b) of the Federal Rules of Civil Procedure, Plaintiff, by and through

his attorney of record hereby demands a jury trial of all of the issues in the above matter.

DATED this 24th day of October, 2017

Respectfully submitted,

**ROSEMAN LAW OFFICES, LLC**

s/ Barry D. Roseman
**Barry D. Roseman**
1120 Lincoln Street, Suite 1306
Denver, CO 80203
Telephone: (720) 917-1300
Fax: (303) 861-9214
E-mail: Barry@RosemanLegal.com
Attorneys for Plaintiff

Dated: October 24, 2017