IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Senior Judge Marcia S. Krieger

Civil Action No. 17-cv-02548-MSK-NRN

LEONARD ENGLISH,

     Plaintiff,

v.

SMALL BUSINESS ADMINISTRATION, and
LINDA MCMAHON, Administrator of the Small Business Administration,

     Defendants.

_____

### OPINION AND ORDER GRANTING MOTION FOR SUMMARY JUDGMENT
_____

**THIS MATTER** comes before the Court pursuant to the Defendants' (collectively "the SBA") Motion for Summary Judgment **(# 45)**, Mr. English's *pro se*[1] response **(# 48)**, and the SBA's reply **(# 51)**.

### FACTS

The Court attempts[2] to summarize the pertinent facts here and elaborates as necessary in its analysis.

Mr. English, a black male, was employed by the SBA as a Surety Bond Guarantee Specialist at the SBA's offices in Denver, Colorado. He began his employment in or about 2005 and continued until his employment was terminated on September 23, 2016. At all pertinent

_____

[1]     Mr. English was represented by counsel when this action was commenced and at the time Mr. English's Amended Complaint **(# 15)** was filed. Thereafter, Mr. English fired his counsel and elected to proceed *pro se*. The Court construes Mr. English's *pro se* filings liberally in accordance with *Haines v. Kerner,* 404 U.S. 519, 520-21 (1972).

[2]     The parties have filed a wealth of materials, but neither side has identified the material facts, much less whether they are disputed or not.

times, Mr. English's direct supervisor was Jennifer Vigil, and Ms. Vigil's supervisor was Peter Gibbs.

The record includes allegations of various workplace unfairness dating back to 2011 or earlier, but it appears that the chronology relevant to this matter began in April 2013, when Ms. Vigil issued what is known as her annual "line of succession,". This a list of SBA staff that are authorized to act on her behalf in her absence. Mr. English had considerable seniority in the office, but he was on a lengthy leave of absence at the time. Thus Ms. Vigil did not include him on the list. At some point he returned, Mr. English and Ms. Vigil discussed the absence of Mr. English's name on the list. Ms. Vigil indicated that "she saw no need to change" the list to include Mr. English. Ms. Vigil re-issued her line of succession in April 2014, adding an additional employee, but again omitted Mr. English.

Ms. Vigil testified that, around this point in time, she perceived that Mr. English's workplace behavior and job performance began to change. She has previously rated him as an exceptional employee on quarterly performance reviews, but beginning in April 2014, she criticized aspects of his performance. She commented to that effect in his quarterly review, and Mr. English disagreed.

Mr. English does not appear to dispute that April 2014 was an inflection point in the course of his employment, and in certain places in the record, Mr. English identifies April 18, 2014 as the beginning of his dispute with Ms. Vigil.[3] Around that point in time, Mr. English also accused that Robert Gomez, one of his co-workers, of creating a hostile working environment. Among other things, Mr. English alleges that Mr. Gomez used profanity when speaking to him

---

[3]    *See e.g. Docket* # 45-23 at 11 ("All of this started because I had a concern about the conversations & behavior of a co-worker . . . and a protected disclosure of time & attendance abuse I made back on April 18, 2014.").

and that Mr. Gomez bragged about having assaulted a female co-worker at a prior job. Mr. English complained about Mr. Gomez' conduct to Ms. Vigil, but Mr. English contends that nothing was done about his complaint. Ms. Vigil testified to an EEO investigator that she verbally counselled Mr. Gomez about his use of profanity and that the SBA re-investigated Mr. Gomez's background but could not substantiate Mr. English's claims that Mr. Gomez had committed a workplace assault.

From that point on, Mr. English's working relationship with Ms. Vigil (and, ultimately, Mr. Gibbs) deteriorated. It is sufficient to note that between then and late 2015, Mr. English filed an array of complaints, formal and informal, internally and externally, accusing Ms. Vigil, Mr. Gibbs, and various other SBA officials of discriminating and retaliating against him, of creating a hostile working environment, and various other transgressions. During that same period of time, Ms. Vigil performed quarterly performance evaluations of Mr. English, rating him as an overall score of 3 (meets expectations) or even a score of 2 (below expectations).

During this period, Ms. Vigil also recommended that Mr. English be disciplined on three separate occasions.[4]

First incident

First, in February 2015, Ms. Vigil proposed suspending Mr. English for 5 days based on two incidents. One arose in December 2014 when Mr. English failed to perform an assigned task by the time specified and did not inform Ms. Vigil of that fact. The second incident arose in

_____

[4]      Mr. Gibbs also *sua sponte* issued a letter of reprimand to Mr. English on May 18, 2015, relating to an incident in which he discovered that Mr. English had failed to complete an assignment before leaving for a day off and failed to advise his co-workers of the need to attend to the unfinished work.

February 2015 when Mr. English e-mailed that he was taking sick time for a day but did not call and speak personally to Ms. Vigil as she had previously instructed.

Ms. Vigil's recommendation of a suspension was reviewed by Linda Rusch, an SBA official, in July 2015. Ms. Rusch found that the sick time incident may have been the result of an honest misunderstanding of the procedure by Mr. English, and she dismissed that charge. But she found that the December 2014 incident was supported by the evidence. Ms. Rusch imposed a letter of reprimand, an admonishment that would remain in Mr. English's personnel file for up to one year and which could serve as a justification for increased punishment if Mr. English engaged in additional misconduct during that period. (Mr. English responded by filing complaints and grievances against Ms. Rusch and others concerning this and all other instances of discipline against him.)

Second incident

In December 2015, Ms. Vigil proposed suspending Mr. English for 30 days. In October 2015, citing a low performance evaluation she had recently given Mr. English, Ms. Vigil informed Mr. English that his authorization to telework would be suspended beginning November 2, 2015. On November 3, 2015, Mr. English did not appear at the office for his scheduled shift. Ms. English contacted him and directed him to report to work, and Mr. English refused. He then e-mailed an HR representative, stating that he felt "unsafe being in the office with [Ms. Vigil] and her team," because she is "volatile, hostile, and harassing." Mr. English invoked the self-removal provisions of the collective bargaining agreement and refused to come into work "until this is investigated."

The Court pauses here to explain the reference to a "self-removal." Employees at the SBA are represented by a union and are subject to a collective bargaining agreement. The terms

of that agreement include a section concerning workplace safety and health. That section provides that "any bargaining unit employee who is assigned duties which he or she reasonably believes could possibly endanger his or her health or safety may notify the appropriate supervisor of the situation." If the supervisor and the employee "[cannot] agree that a reasonable belief exists that unhealthy or unsafe conditions prevent immediate continued work on the assignment, the matter shall be referred immediately to the next higher level of supervision." Pending consideration of the matter, "the assignment shall be deferred" and the employee "shall not be placed on sick or annual leave or leave without pay, or AWOL status, nor shall that employee be considered to be insubordinate." An employee's invocation of this provision is labeled a "self-removal."

In response to Mr. English's invocation of the self-removal process, HR representatives contacted Mr. English to get more information about his concerns about Ms. Vigil, particularly whether she had physically or verbally assaulted him or threatened him with violence. Mr. English responded via e-mail that:

> Jennifer Vigil is provoking and volatile. I've requested a witness to any meetings with her and I've been ignored. When we met Thursday, she seems to want to argue. When she called me with threats of disciplinary action this morning, it was argumentative. I'm very uncomfortable being in her presence, I don't know what she will do. . . . To me, that is a very threatening environment.[5]

---

[5]     In addition to citing to Ms. Vigil's alleged "hostility" and "volatile" nature, Mr. English sometimes argues that he felt physically threatened by Ms. Vigil because of one occasion in which she "stalked" him in a parking lot. The precise contours of that incident are somewhat unclear, but as best the Court can determine, Mr. Vigil left work one day and noticed Mr. English still sitting in his car in the parking lot, despite the fact that he had left work about an hour earlier. It is unclear whether Ms. Vigil approached Mr. English's car or whether any other events occurred after this. Mr. English characterizes this behavior as Ms. Vigil "stalking" him (although on other occasions, it appears that Ms. Vigil accused Mr. English of stalking her). Mr. English has also alleged, on various occasions, that he was concerned that, if he met alone with Ms. Vigil, she might falsely accuse him of "touch[ing] her inappropriately" or that she might "stab [him] with a letter opener."

Consistent with the self-removal policy, Mr. English's invocation of self-removal was forwarded to Frank Lalumiere, an SBA official having supervisory oversight over Ms. Vigil. On November 5, 2015, Mr. Lalumiere advised Mr. English that his self-removal was not based on a reasonable belief of a health or safety risk (insofar as the collective bargaining agreement specifically required that self-removals be based on <u>objectively</u>-reasonable safety and health concerns[6]) and directed Mr. English to come into work immediately. It is not clear whether Mr. English complied with Mr. Lalumiere's instructions, but the Court assumes that he did. Ms. Vigil's recommendation of a suspension is also based on several instances in which she alleged that Mr. English engaged in unprofessional behavior towards her and others. For example, when she instructed him that his telework schedule had been terminated and that he should appear in person at work, Mr. English responded asking "if she thought I was her child." (Mr. English admits making that statement, offering only the justification that "I was provoked.")

In May 2016, Mr. Gibbs found that Mr. English had committed the misconduct identified by Ms. Vigil and upheld her recommendation that Mr. English be suspended for 30 days.

<u>Third incident</u>

On April 22, 2106, Ms. Vigil had a conversation via instant message concerning some of Mr. English's work that had not been properly processed. That conversation reads as follows:

MS. VIGIL: . . . Why did we miss them?

MR. ENGLISH: The agent didn't submit the correct information.

---

[6]    Specifically, the self-removal procedure states that an employee must "reasonably believe[ ]" that an assignment could possibly endanger his health or safety. It further states that "Reasonable belief in this respect shall be construed to be that belief which an adult, exercising normal prudence and knowledge, would be justified in holding under the particular circumstances attendant in the case in point."

MS. VIGIL: The contract page reads that the subs are only 7%. Did they change it in the system? I'd like to discuss what happened with these.

MR. ENGLISH: Look at the 994. It will tell you everything you need to know.

MS. VIGIL: Please come into my office to discuss. Thanks!

MR. ENGLISH: I have a ton of requests to work on before I leave in les than 2 hours. Let's discuss that request later.

MS. VIGIL: It will only take 5 minutes. Thanks!

MR. ENGLISH: I would like a witness.

MS. VIGIL: It's not disciplinary. Please just come in and tell me about these 2 missed bids.

MR. ENGLISH: What would you like to know?

MS. VIGIL: Leonard, please come into my office to discuss. No need for back and forth argument.

MR. ENGLISH: I detect some hostility. Do I need to perform a self-removal regarding this[?] I'm very uncomfortable meeting with you.

Ms. Vigil then asked one of Mr. English's co-workers, Danny Vu, to witness their discussion. Ms. Vigil and Mr. Wu went to Mr. English's desk, but Mr. English refused to discuss the matter unless the witness was from the HR department instead. Mr. English again threatened to self-remove and Ms. Vigil informed him that "there will be consequences if you leave." Ms. Vigil then went to seek out an HR representative to witness the meeting, but Mr. English left the office. Over that weekend, Mr. English e-mailed the SBA's Chief Operating Office, advising that he had performed a self-removal because he felt threatened by Ms. Vigil.

The next day, Mr. Gibbs wrote to Mr. English acknowledging that he understood that Mr. English intended his early departure on April 22 to constitute a self-removal under the collective

bargaining agreement.  Mr. Gibbs advised that, under the terms of the self-removal procedure, he was the next highest level of supervision over Ms. Vigil.  He stated that he had reviewed the self-removal procedure, including the requirement that an employee's belief in a health or safety risk must be objectively "reasonable" and concluded that "there was no valid reason for you to leave the office without approval."  Accordingly, Mr. Gibbs informed Mr. English that he would be treated as "AWOL for leaving the worksite without approval."  Mr. Gibbs instructed Mr. English to return to duty on April 26 as normal, or else he would "be charged AWOL for your absence and will be subject to disciplinary action." Mr. English did not return to work until May 17, 2016, although the record does not appear to disclose any events or communications that occurred in the interim.  Upon arriving back at work on May 17, Mr. English then began serving the 30-day suspension discussed above.

On June 17, 2016, apparently back at work, Mr. English and Ms. Vigil had a dispute over whether Mr. English's timesheet was correct.  Ms. Vigil asked Mr. English to correct the timesheet, and Mr. English refused, stating that it was another employee's responsibility to do so. Ms. Vigil again instructed Mr. English to make the correction, and Mr. English responded "are we going to do this every day?  Are you going to talk to me like your child? . . . Why don't you go home and speak to your child."

On August 4, 2016, Ms. Vigil wrote to Mr. English, informing him that she was proposing his termination.  The letter stated that it was based on: (i) his AWOL status during and after the April 22 incident; (ii) his failure to follow her instructions on April 22; and (iii) that various comments he made to Ms. Vigil and others on April 22, June 17, and other days constituted unprofessional conduct.  Mr. English filed a written response to the letter, challenging various aspects of it.  On September 23, 2016, after evaluating Ms. Vigil's

recommendation and Mr. English's response, Mr. Gibbs upheld the recommendation and terminated Mr. English, effective that same day.

Mr. English filed an appeal of his termination (as well as of his exclusion from Ms. Vigil's 2014 and 2015 lines of succession) with the Merit Systems Protection Board ("MSPB"). In March 2017, the MSPB denied Mr. English's appeal and upheld his termination. Mr. English appealed the MSPB's determination to the Equal Employment Opportunity Commission ("EEOC"), but on September 25, 2017, the EEOC affirmed the MSPB's finding that the termination was permissible.

Mr. English, through counsel, then commenced this action. His Amended Complaint **(#15)** asserts only two claims: (i) race discrimination in violation of Title VII of the Civil Rights Act, 42 U.S.C. § 2000e *et seq.*, and (ii) retaliation in violation of Title VII. But the lengthy pleading can be read to assert those same claims as against a whole series of employment decisions by the SBA, dating as far back as Ms. Vigil's 2013 line of succession list (which the Amended Complaint alleges Ms. Vigil "purposely left the African American employees off"), and including several quarterly performance reviews and multiple instances of disciplinary letters of reprimand, among others.

The SBA now moves **(# 45)** for summary judgment on all of Mr. English's claims. The Court will discuss the particular arguments raised by the SBA as part of the analysis herein.

## ANALYSIS

### A. Standard of review

Rule 56 of the Federal Rules of Civil Procedure facilitates the entry of a judgment only if no trial is necessary. *See White v. York Intern. Corp.*, 45 F.3d 357, 360 (10th Cir. 1995). Summary adjudication is authorized when there is no genuine dispute as to any material fact and

a party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). Substantive law governs what facts are material and what issues must be determined. It also specifies the elements that must be proved for a given claim or defense, sets the standard of proof and identifies the party with the burden of proof. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Kaiser-Francis Oil Co. v. Producer's Gas Co.*, 870 F.2d 563, 565 (10th Cir. 1989). A factual dispute is "genuine" and summary judgment is precluded if the evidence presented in support of and opposition to the motion is so contradictory that, if presented at trial, a judgment could enter for either party. *See Anderson*, 477 U.S. at 248. When considering a summary judgment motion, a court views all evidence in the light most favorable to the non-moving party, thereby favoring the right to a trial. *See Garrett v. Hewlett Packard Co.*, 305 F.3d 1210, 1213 (10th Cir. 2002).

If the movant has the burden of proof on a claim or defense, the movant must establish every element of its claim or defense by sufficient, competent evidence. *See* Fed. R. Civ. P. 56(c)(1)(A). Once the moving party has met its burden, to avoid summary judgment the responding party must present sufficient, competent, contradictory evidence to establish a genuine factual dispute. *See Bacchus Indus., Inc. v. Arvin Indus., Inc.*, 939 F.2d 887, 891 (10th Cir. 1991); *Perry v. Woodward*, 199 F.3d 1126, 1131 (10th Cir. 1999). If there is a genuine dispute as to a material fact, a trial is required. If there is no genuine dispute as to any material fact, no trial is required. The court then applies the law to the undisputed facts and enters judgment.

If the moving party does not have the burden of proof at trial, it must point to an absence of sufficient evidence to establish the claim or defense that the non-movant is obligated to prove. If the respondent comes forward with sufficient competent evidence to establish a *prima facie*

claim or defense, a trial is required. If the respondent fails to produce sufficient competent evidence to establish its claim or defense, then the movant is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

### B. Race discrimination claims

The Court turns first to Mr. English's allegations that his termination (and other employment actions discussed above and herein) constitute discrimination against him on the basis of his race.

Generally, race discrimination claims are analyzed under the familiar *McDonnell-Douglas* burden-shifting framework. Mr. English must first demonstrate a *prima facie* case by showing: (i) that he is a member of a protected class, (ii) that he had the objective qualifications for the position he occupied, (iii) that he suffered a materially-adverse employment action; and (iv) that the employment action took place in circumstances giving rise to an inference of discrimination. *See generally Braxton v. Nortek Air Solutions, LLC*, 769 Fed.Appx. 600, 603 (10th Cir. 2019). If Mr. English carries that burden, the SBA has the burden to articulate a legitimate and non-discriminatory reason for the employment action, and Mr. English has the ultimate burden to demonstrate that the SBA's stated reason is false and a pretext for race discrimination. *Mitchell v. Kansas City School Dist.*, 714 Fed.Appx. 884, 887 (10th Cir. 2017).

There is no dispute that Mr. English can establish the first two elements of a *prima facie* case – that his is a member of a protected class and had the minimum objective qualifications for his position. And there is no doubt that, at the very least, his termination constitutes a materially-adverse employment action. However, the Court is not persuaded that he has come forward with evidence sufficient to demonstrate that his termination – much less any of the other alleged adverse actions discussed herein -- occurred in circumstances giving rise to an inference of race

discrimination.  Nevertheless, in the interests of ensuring a full evaluation of Mr. English's

evidence, the Court will skip over the relatively light burden of the *prima facie* case[7]  and

proceed to the analysis of whether the SBA's proffered reason for Mr. English's termination –

his being AWOL for several weeks and his unprofessional behavior towards Ms. Vigil – is

pretextual.

 To establish pretext, an employee must point to "such weaknesses, implausibilities,

inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons

for its action that a reasonable factfinder could rationally find them unworthy of credence."

*Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1323 (10th Cir. 1997).  The bulk of Mr. English's argument

on this issue is devoted to contending that Mr. Gibbs misapplied the self-removal provisions in

the collective bargaining agreement, and thus, lacked the authority to order Mr. English back to

work.  Arguably, an employer's deviation from a written company policy that prescribed the

action to be taken under specific circumstances can be evidence of pretext.  *Kendrick v. Penske*

*Transp. Servs.*, 220 F.3d 1220, 1230 (10th Cir. 2000).  But the Court finds that Mr. English has

failed to come forward with evidence showing that the SBA's rejection of his purported self-

removal was improper.

---

[7] The SBA goes to some length to argue that the Court should find that because Mr. Gibbs is also black, any inference that he might hold racial animus towards Mr. English is "less plausible" and "weakened."  *Citing, inter alia, Almon v. Goodyear Tire & Rubber Co.*, 2009 WL 1421199 (D.Kan. May 20, 2009) *and Drummond v. IPC Intl., Inc.*, 400 F.Supp.2d 521, 532 (E.D.N.Y. 2015).  The Court finds the reasoning of these cases unpersuasive.  As the Supreme Court stated in *Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75, 79 (1998) – a case *Almon* quotes but then apparently ignores -- "we have rejected any conclusive presumption that an employer will not discriminate against members of his own race."  Historical and contemporary examples of members of a given race discriminating against other members of that same race are so common as to not require citation.  To reason that such discrimination is unlikely to occur is, if anything, yet another form of improper race-based stereotyping.

First, the record reveals that Mr. Gibbs properly applied the terms of the self-removal procedure. Once Mr. English and Ms. Vigil disagreed about whether Ms. Vigil's "assignment" – that Mr. English come to her office to discuss the two files that he had not completed – created "unhealthy or unsafe conditions" for Mr. English, the procedure required that the matter "be referred immediately to the next higher level of supervision" above Ms. Vigil -- that is, Mr. Gibbs. Mr. Gibbs determined that Mr. English had not effectuated a valid self-removal under the procedure because Mr. English's professed belief that complying with Ms. Vigil's instructions to discuss the matter in her office would be unsafe or unhealthy was not an objectively "reasonable" one, as the agreement required. As noted above, the procedure requires that the employee's belief that an assignment is unsafe must be a belief that "an adult, exercising normal prudence and knowledge, would be justified in holding under the particular circumstances." The evidence is clear and undisputed that Mr. Gibbs believed that Mr. English had no objective basis to profess a belief that Ms. Vigil might physically assault him or otherwise harm him, and that Mr. English was resorting to the self-removal procedure simply for vexatious purposes. Once Mr. Gibbs made the determination that Mr. English's self-removal was improper, the protections offered by the self-removal procedure, such as protection against being deemed AWOL, no longer applied. Arguments about whether Mr. Gibbs met other requirements in the self-removal procedure, *e.g.* whether Mr. Gibbs was a "Regional Administrator" or at the "Assistant or Associate Administrator level in the Headquarters" and thus eligible to direct an employee to return to work under Section 5 of the procedure, are irrelevant. Once it was determined that Mr. English's purported "self-removal" was improper because it lacked an objectively-reasonable basis, Mr. English no longer enjoyed the procedure's protections against being deemed AWOL. Thus, the Court cannot conclude that Mr. English has shown a triable issue of fact as to whether

Mr. Gibbs' order that he return to work immediately in April 2016 violated the terms of the self-removal procedure.

But even assuming it did, the mere fact that an employer violated a written procedure does not, in and of itself, suffice to demonstrate a triable question of fact with regard to pretext. Particularly in situations where the written procedure itself is complex or ambiguous, or where the employer is rarely called upon to interpret it, an employer's failure to properly apply that procedure still might not permit an inference that the mistaken application hides a discriminatory motive. *See generally EEOC v. Flasher Co.*, 986 F.2d 1312, 1319-20 (10th Cir. 1992); *see also Kendrick*, 220 F.3d at 1232 ("differences in treatment that are trivial or accidental or explained by a nondiscriminatory motive will not sustain a claim of pretext"). Here, the self-removal policy arguably has several ambiguities as to how it should be applied,[8] and the record appears to reflect that the policy is rarely invoked by SBA employees. In such circumstances, Mr. Gibbs' failure to apply it correctly does not necessarily lead to an inference that such a failure permits an inference that Mr. Gibbs was concealing racial animus. Here, Mr. English points to nothing in the record that would suggest that any misapplication of the self-removal policy by Mr. Gibbs was anything other than accidental. Accordingly, the Court cannot find that Mr. English has come forward with evidence that indicates that Mr. Gibbs' finding that he had not properly invoked the self-removal policy and was AWOL for several weeks was pretextual.

---

[8]     Among others, there is an arguable ambiguity between Section 4, which calls upon the employee's second-line supervisor to be involved, and Section 5 which seems to suggest that only higher-level employees can order the employee back to work. This leaves the role of the second-line supervisor in addressing a claim of self-removal unclear. There is also an ambiguity as to what occurs when a claim of self-removal is deemed to be objectively unreasonable under the procedure and who is authorized to make such a finding.

Although the conclusion that Mr. English was AWOL for several weeks might, in and of itself, be a justifiable basis for his termination, the Court also considers the additional grounds cited by Mr. Gibbs, namely Mr. English's unprofessional conduct towards Ms. Vigil on various occasions. Mr. Gibbs found that Mr. English did not deny the facts relating to any of the particular events – that is, Mr. English essentially concedes that he made the comments cited in Ms. Vigil's recommendation, even if he disputes how those comments should be interpreted or classified. Mr. English argues that he can show that his non-black co-worker, Mr. Gomez, engaged in similar behavior but was not terminated. Where an employee can show that similarly-situated individuals outside the protected class engaged in misconduct of similar severity but received more favorable treatment, an inference of pretext might arise. *Kendrick*, 220 F.3d at 1232.

The Court finds that Mr. English has not adduced facts that raise a genuine issue as to whether Mr. Gomez's misconduct was similar to his own. The record reflects that Mr. English complained to Ms. Vigil that Mr. Gomez had been unprofessional to <u>Mr. English</u>, not towards Ms. Vigil. Although one would hope that employees demonstrate the same sort of professionalism towards their colleagues that they are expected to display towards their supervisor, there is a qualitative difference between squabbling with a co-worker and squabbling with one's supervisor. Moreover, the Court understands that Mr. English complained of only a single instance of Mr. Gomez speaking unprofessionally to him, whereas the various disciplinary charges against Mr. English recite numerous occasions in which Mr. English engaged in unprofessional conduct. Thus, the Court finds that Mr. English has not shown that Mr. Gomez is an appropriate comparator and therefore has now shown that any employees guilty of similar misconduct were treated more favorably.

For these reasons, the Court finds that Mr. English has not come forward with evidence creating a genuine dispute of fact on the issue of pretext and that the SBA is entitled to summary judgment on Mr. English's claim that his termination was the result of racial discrimination.

The same analysis disposes of any other race discrimination claims that Mr. English premises on other alleged adverse actions. Whether those actions take the form of the 30-day suspension from May to June 2016, letters of reprimand issued to him in 2014 and 2015, adverse performance evaluations in 2014 and 2015, and even his exclusion from Ms. Vigil's line of succession list in 2013 and 2014,[9] Mr. English has not come forward with evidence that suggests that the decisionmakers with regard to those events – Ms. Vigil, Mr. Gibbs, and Ms. Rausch, among others – were motivated by Mr. English's race at any point in time. Once again, Mr. English cannot point to any evidence of racially-charged comments or actions by any of the decisionmakers or otherwise show that their reasons for those actions are pretexts for race discrimination. Mr. English may certainly feel that his supervisors were unfair, non-responsive, or arbitrary, but this Court does not sit as a "super-personnel department," interposing its own opinions as to how a supervisor should have responded to a given incident. *Dewitt v. Southwestern Bell Telephone Co.*, 845 F.3d 1299, 1307-08 (10th Cir. 2017). The SBA's management staff is entitled to make mistakes, act carelessly, or even make decisions that are unfair, so long as those decisions are not motivated by consideration of improper classifications. Here, because Mr. English has not come forward with any evidence to suggest that any of the

---

[9]     Many of these events would not even rise to the level of being actionable adverse employment actions. *See generally Lujan v. Johanns*, 181 Fed.Appx. 735, 737 (10th Cir. 2006).

decisions taken against him were done because of his race, the SBA is entitled to summary judgment on his race discrimination claims in their entirety.[10]

## C. Retaliation

To establish a claim for retaliation under Title VII, Mr. English must first establish a *prima facie* case by showing that: (i) he engaged in conduct protected by Title VII, (ii) that he suffered an adverse employment action, and (iii) that the adverse employment action was causally connected to the protected activity. If Mr. English carries this burden, the SBA must articulate a legitimate, non-retaliatory reason for the adverse action and Mr. English bears the burden of showing that the SBA's proffered reason is a pretext for retaliation. *Laul v. Los Alamos Natl. Labs.,* 765 Fed.Appx. 434, 441 (10th Cir. 2019). An adverse employment action is one that would deter a reasonable employee from engaging in conduct protected by Title VII. *Burlington Norther and Santa Fe RR Co. v. White*, 548 U.S. 53, 68 (2006).

The Court finds that Mr. English can establish a *prima facie* case of retaliation, both as to his termination and as to the imposition of various forms of discipline between 2014 and 2016 and as to unfavorable performance evaluations he received in 2014 and 2015. It is undisputed that Mr. English was a serial filer of internal and external complaints and charges of discrimination and retaliation, each of which constitutes protected activity under Title VII. The

---

[10]     To the extent Mr. English purports to assert a claim for a racially-hostile working environment, the Court would also grant summary judgment to the SBA. Mr. English has not come forward with facts showing that he was subjected to repeated instances of racially-discriminatory ridicule, insult, or harassment from any person. Rather, the incidents that Mr. English describes amount to little more than the "run-of-the-mill boorish, juvenile, or annoying behavior that is not uncommon in American workplaces," or "the ordinary tribulations of the workplace, such as the sporadic use of abusive language. . . ." *See Morris v. City of Colorado Springs*, 666 F.3d 654, 663-64 (10th Cir. 2012) *and Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998). Friction between Mr. English and his co-workers and supervisors about their tone of voice or attitudes or their failure to conduct themselves in the manner that Mr. English would prefer does not amount to a hostile environment claim for Title VII purposes.

causal connection element can be satisfied merely by showing that the alleged adverse action occurred in close temporal proximity to the protected conduct.  *See Davis v. BAE Systems*, 764 Fed.Appx. 741, 744 (10th Cir. 2019).  Because of his prolific protected activity, Mr. English was never more than a few weeks or months away from his most recent charge, complaint, or appeal, and thus, all of the employment actions he complains of occurred in close proximity to one or more instances of protected activity.

But for the same reasons discussed above, the Court finds that Mr. English has failed to come forward with evidence that demonstrates that the reasons proffered by the SBA for his termination or the other adverse actions at issue here is a pretext for retaliation.  As discussed above, the evidence is undisputed that Mr. Gibbs directed Mr. English to cease his alleged self-removal in April 2016 and return to work, and that Mr. English did not do so.  Likewise, the Court has determined that Mr. English does not materially dispute making the various comments towards Ms. Vigil, and Mr. Gibbs concluded that those comments were unprofessional.  Those actions constitute a legitimate, non-retaliatory reason for Mr. English's termination, and the fact that Mr. English was simultaneously engaged in a campaign of serially filing EEO complaints and grievances does not suffice to demonstrate that Mr. Gibbs' decision was a pretext for retaliation.

Notably, the 10th Circuit has repeatedly held that close temporal proximity between the protected conduct and the adverse action, standing alone, is insufficient to carry an employee's burden to demonstrate pretext.  *See DePaual v. Easter Seals El Mirado*, 859 F.3d 95, 976 (10th Cir, 2017) *and cases cited therein*; *Lounds v. Lincare, Inc.*, 812 F.3d 1208, 1236 n. 10 (10th Cir. 2015).  But Mr. English's showing with regard to pretext offers little more than temporal proximity.  He can point to no evidence of prior comments or actions by Mr. Gibbs indicating

retaliatory animus, he cannot demonstrate that employees who committed similar disciplinary infractions but did not engage in protected conduct were treated more favorably, and he has not come forward with evidence that Mr. Gibbs' interpretation of the self-removal procedure differed from ways in which the SBA had applied that procedure in previous situations. Accordingly, the Court finds that the SBA is entitled to summary judgment on Mr. English's claim that he was terminated as retaliation for engaging in protected conduct.

The Court turns to the other instances of discipline imposed by the SBA on Mr. English. The basic terms of the 30-day suspension approved by Mr. Gibbs in May 2016 are essentially identical to the circumstances that led to Mr. English's termination: he refused to come to work, invoking the self-removal provisions in the collective bargaining agreement, and an SBA official ultimately rejected that invocation, finding in objectively unreasonable. For the same reasons that the Court has concluded that Mr. English has not demonstrated a triable issue with regard to his termination, so he fails to demonstrate a triable issue as to whether the SBA's reasons for the 30-day suspension are pretextual. Mr. English's purported grounds for invoking the self-removal provision in this instance are set forth in writing and Mr. Gibbs' conclusion that those reasons are unreasonable was based directly on the undisputed contents of Mr. English's e-mail. The Court need not conclude that Mr. Gibbs' interpretation of the evidence – that Mr. English was frivolously invoking the self-removal procedure for vexatious purposes -- is the only correct one; the Court must merely conclude that Mr. Gibbs subjectively believed that Mr. English's explanation was frivolous and objectively unreasonable. Put another way, Mr. English has the burden of showing that Mr. Gibbs himself did not even believe the reasons he was giving for imposing the suspension. *Laul*, 765 Fed.Appx. at 440. Mr. English has not done so.

Accordingly, the SBA is entitled to summary judgment on Mr. English's retaliation claim premised on the 30-day suspension as well.

As to the letters of reprimand imposed by Mr. Gibbs and Ms. Rausch, the Court is not convinced that a letter of that type constitutes an adverse employment action sufficient to support a retaliation claim. *See Haynes v. Level 3 Communications, LLC*, 456 F.3d at 1215, 1224-25 (10th Cir. 2006). But even assuming they are – *e.g.* because the SBA relied upon their issuance to impose greater discipline for subsequent infractions – the Court reaches the same conclusions above for the same reasons. Although Mr. English might disagree with the conclusions that Mr. Gibbs and Ms. Rausch reached from the evidence, the facts upon which they relied were essentially undisputed – Mr. English effectively admits he did not complete the assignments at issue in each incident, even if he offers explanations in mitigation. Mr. English has not come forward with evidence that indicates that Mr. Gibbs and Ms. Rausch did not honestly believe that the missed assignments constituted misconduct by Mr. English, nor that a mild reprimand was an appropriate penalty.

Finally, the Court finds that poor performance evaluations given by Ms. Vigil to Mr. English in 2014 and 2015 do not constitute adverse employment actions, as Mr. English has not come forward with evidence that indicates how such evaluations affected his salary or job grade. *Haynes*, 456 F.3d at 1224.

Accordingly, the Court finds that the SBA is entitled to summary judgment on Mr. English's retaliation claim in its entirety.

## CONCLUSION

For the foregoing reasons, the SBA's Motion for Summary Judgment (**# 45**) is

**GRANTED**.  The Clerk of the Court shall enter judgment in favor of the SBA on all claims and

thereafter close this case.

Dated this 7th day of August, 2019.

BY THE COURT:

Marcia S. Krieger
Senior United States District Judge